IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

        Plaintiff,

v.

OBAIDULLAH SYED,

        Defendant.

Case No. 20 CR 629-1

Honorable Mary M. Rowland

## **DEFENDANT OBAIDULLAH SYED'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**

Ryan S. Hedges, Esq.
Junaid A. Zubairi, Esq.
Nusra Ismail, Esq.

VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 312 609 7500
rhedges@vedderprice.com
jzubairi@vedderprice.com
nismail@vedderprice.com

*Attorneys for Defendant Obaidullah Syed*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 3

ARGUMENT .......................................................................................................................... 5

I.     The Government Fails to Prove the PAEC Was the End-User of the Onyx 3400............. 5

II.    The Government Fails to Prove the Tezro System Was Exported to Any Entity, Let Alone the NDC ........................................................................................................... 6

III.   A Downward Departure Pursuant to § 2M5.1, Application Note 2 Is Warranted........... 10

     A.     The Government's Characterization of the PAEC Is Outdated .......................... 10

     B.     The Exported Goods Were Not High Performing ............................................... 12

IV.   The Government Fails to Prove that Mr. Syed Was an Organizer and Leader of a Criminal Activity Involving Five or More Participants.................................................... 15

V.    A "Significant Sentence of Imprisonment" Is Not Warranted........................................ 19

CONCLUSION....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Caputo*,
No. 07 CR 458-4, 2010 WL 1032621 (N.D. Ill. Mar. 17, 2010) ...........................................16

*United States v. Hall*,
101 F.3d 1174 (7th Cir. 1996) ...........................................................................................13, 16

**Statutes**

18 U.S.C. § 3553(a) ...........................................................................................................1, 3, 17, 19

USSG § 2M5.1, App. Note 2 ...........................................................................................................2, 8

USSG § 3B1.1(a) ...........................................................................................................13, 16, 17

USSG § 3B1.1(a), App. Note 1...........................................................................................................13

USSG § 3B1.1(c) ...........................................................................................................17

**Other Authorities**

66 FR 50090...........................................................................................................8

Institute for Science and International Security Report on Pakistan's Growing Uranium
Enrichment Program (May 30, 2018), https://isis-online.org/isis-
reports/detail/pakistans-growinguranium-enrichment-program/12 (last visited
March 29, 2022)...........................................................................................................9

-ii-

## PRELIMINARY STATEMENT

Near the end of the government's sentencing memo, the government seems to recognize Mr. Syed's advanced age of 67 years and his "concerning medical history" (ECF 69 at 30), which includes three separate heart attacks, each of which required hospitalization, ongoing cardiovascular problems and serious other health issues including Type II diabetes (PSR ¶¶ 43-48). But the government then coldly turns those facts on their head, suggesting that Mr. Syed's advanced age is actually an aggravating factor because it supposedly provided the "years of experience" necessary to carry out the offense. (ECF 69 at 30.) Offering its opinion that Mr. Syed "is, at age 67, an older man; but he is not old," the government argues for a sentence of 48 months in prison. The government's draconian proposed sentence is twice as long as the sentence recommended by the Probation Officer. The truth is that either recommended sentence would, in all likelihood, be the equivalent of a death sentence for Mr. Syed given his age and poor health. Both recommended sentences are far greater than necessary to sufficiently achieve the purposes of sentencing in this case under 18 U.S.C. § 3553(a), and therefore they are not appropriate.

The government argues that over decades of life experience Mr. Syed "learned the ins and outs of U.S. export laws and regulations, and how to evade them." (ECF 69 at 30.) This leaves one to wonder: What case is the government talking about? In the case that is before this Court, Mr. Syed has pleaded guilty and accepted responsibility for exporting certain equipment from the United States without the requisite license from the Department of Commerce, and supported by export documentation that contained false information. The offense was "[not] overly sophisticated," as the Probation Officer correctly noted, and involved only five isolated transactions during Mr. Syed's 36-year tenure at Business Systems International, Pvt. Ltd. ("BSI"). (Sentencing Recommendation (Disclosed) at 2.) Two of the five transactions involved goods valued at only $2,650.00 and $533.28, respectively. (GV Ex. 39B; ECF 56 at 14.) Contrary to the

government's argument, this clearly is not the track record of a highly skilled and experienced "evader" of U.S. export controls, or anyone else who should serve years in prison.

Similarly, the government's aggressive attempt to recast the relevant transactions as a serious threat to U.S. national security is altogether overblown. Mr. Syed's computing power expert established that the computer systems exported in this case were low-powered and not high performing, (ECF 68-4), and so did the government's own experts at Los Alamos. If these low-powered computer systems posed any actual threat to the national security of the United States (and there is no actual evidence of any such threat), it was extremely minimal in nature and a downward departure under Guideline § 2M5.1, Application Note 2 is warranted. This conclusion is supported by the government's lack of urgency in investigating this case over the course of ten years, then arresting Mr. Syed in September 2020, just before the statute of limitations expired five years after the final relevant transaction (involving goods valued at only $533.28) (ECF 56 at 14.)

Since his arrest in September 2020 and following his release on bond after spending ten days in Winnebago County Jail during the height of the pandemic, Mr. Syed has been fully compliant with all conditions of his bond and with the presentence investigation. The Probation Officer agrees that Mr. Syed "has demonstrated a lengthy period of law-abiding conduct and amenability to the Court's orders and supervision." (Sentencing Recommendation (Disclosed) at 2.) At or before sentencing, Mr. Syed will pay an agreed forfeiture amount of $247,000 pursuant to a personal money judgment. His life savings are gone and he and his wife will have to be financially supported by their children for the rest of their lives. Additionally, Mr. Syed, who has already suffered three heart attacks, has exhibited deteriorating health during the pendency of this case.

In light of the history and characteristics of Mr. Syed, the actual facts regarding the nature of the offense, and considering all of the sentencing factors set forth in 18 U.S.C. § 3553(a), the sentences recommended by the government and the Probation Officer are greater than necessary and therefore are not appropriate. Mr. Syed respectfully requests that the Court vary downward pursuant to 18 U.S.C. § 3553(a) to impose a sentence of time served (ten days) and a 2-year term of supervised release because such a sentence is sufficient but not greater than necessary to achieve the purposes of sentencing in this particular case.

## **ARGUMENT**

The government's aggressive attempts to establish facts to support uncharged conduct and a role enhancement for Mr. Syed are based almost entirely on the government's own interpretation of select emails and other documents. Often times, the government's interpretation of a document strains credulity. Other times, a document may also be reasonably read to support Mr. Syed's position. This is not proof by a preponderance. At the end of the day, the Court should reject the government's unnecessarily aggressive efforts to establish facts beyond its indictment and the parties' plea agreement in an attempt to enhance Mr. Syed's sentence.

## I. **The Government Fails to Prove the PAEC Was the End-User of the Onyx 3400**

In the plea agreement, Mr. Syed admitted that in exporting the Onyx 3400, Mr. Syed and BSI identified "Taxila University" as the end-user but failed to identify the PAEC as the purchaser. (ECF 56 at 6.) The government now seeks to establish that Taxila University was not actually the end-user of the Onyx 3400.

In support of its claim, the government alleges that an email from January 2009 (seven years after the transaction) somehow establishes that the PAEC was the true end-user of the Onyx 3400. (ECF 69 at 12.) The government's interpretation of the email is wrong. In the email, the BSI employee clearly refers to "information of UET Taxila machine." (GV Ex. 18.) In other words,

information relating to a machine belonging to Taxila University. The email goes on to confirm that the "customer name" is "University of Engineering and [Technology] Taxila" and notes "[a]ctual customer: PAEC." The government treats this language almost as a smoking gun of sorts (ECF 69 at 12), but in actuality it is completely consistent with what really happened—PAEC was the entity that paid BSI for the Onyx 3400 to be used by Taxila University. For the same reasons, PAEC was the entity who contacted BSI when replacement parts were needed for the Onyx 3400.

Additionally, the government suggests that there is "no evidence that Taxila University had anything to do with this computer." (ECF 69 at 12.) Not true. Purchase orders and internal documents from Computer Company A clearly show that the Onyx 3400 was meant for Taxila University. (GV Ex. 13, 14.) Other forms demonstrate that Taxila University's existing systems included the Onyx 3400 (GV Exs. 49B, 53.) And during Mr. Syed's custodial interview following his arrest in September 2020, he stated that the Onyx 3400 was provided to Taxila University. (*See* DV at 3.)

With respect to the Onyx 3400, the government provides only self-serving interpretations of a few select documents, while completely ignoring other documents that support a different view. This falls well short of proving by a preponderance that the true end-user of the Onyx 3400 was the PAEC, and not Taxila University.

## II.    The Government Fails to Prove the Tezro System Was Exported to Any Entity, Let Alone the NDC

After failing to uncover sufficient evidence to include a charge in the indictment related to an alleged unlawful export of a Tezro computer work station and TP9300 computer storage system (the "Tezro system"), the government now seeks to prove up the allegations as relevant conduct. But the government cannot meet its burden even by a preponderance. There is no evidence that

Mr. Syed and BSI unlawfully exported the Tezro system. In reality, nobody ever paid BSI for the Tezro system, it was only used for demonstration purposes and it rarely if ever functioned properly.

The government claims that "Syed and BSI arranged for the unlawful export" of the Tezro system "to NDC in Pakistan without obtaining a license." (ECF 69 at 14.) But the evidence proffered by the government only establishes, at best, that (1) BSI placed an order with Computer Company A for the Tezro systems; (2) BSI represented to Computer Company A that the Tezro system would be used for demonstration purposes; and (3) Computer Company A shipped the Tezro system to BSI in June 2004. Thus, the government's claim fails.

To support its theory that the Tezro system was then sold to the NDC, the government in conclusory fashion labels three individuals as "NDC Employee A," "NDC Employee B," and "NDC Employee C." But there is insufficient proof that the individuals were actually affiliated with NDC at the time the Tezro system was shipped to BSI in 2004. Indeed, the government cites to several documents which do not even *once* use the terms "National Development Complex" or "NDC." For example, the government claims that the Tezro system went to the NDC because of an email Mr. Syed sent to "Mohammad Asif" in 2004. (GV Ex. 28A.) The face of the email has no indication that "Mohammad Asif" is affiliated with the NDC. Another email relied on by the government simply refers to a Tezro system and "Asif Sb," with no indication of who "Asif Sb" is or whether he is affiliated with the NDC. (GV Ex. 29.) The government also asserts, without support, that emails referencing "Dr. Raza's Tezro" or "Raj Muhammad" demonstrate that the Tezro system went to the NDC. (GV Exs. 30-35.) Again, none of these emails have any reference whatsoever to the NDC. [1]

---

[1] Moreover, some of the government's proffered evidence is internally inconsistent and thus has questionable evidentiary value. For example, GV Ex. 32 purports to be an email from "Raj Muhammad," but the sender of the email is "Muhammad Tahir."

In an attempt to connect these individuals to the NDC, the government piles inference upon inference and relies on several documents *that have no relation to the Tezro system in 2004 whatsoever*. The government cites to a bank check from 2015 (GV Ex. 97B), eleven years after the Tezro system was shipped to BSI, which was signed by "M**u**hammad Asif" as evidence that "M**o**hammed Asif" was an NDC employee in 2004.[2] But a document created more than a decade after the Tezro system was shipped is barely, if at all, probative of where "Mohammad Asif" may have worked in 2004.[3]

The government further relies on numerous documents it attaches as Exhibit A to its sentencing memorandum, which it admits are "unrelated to the Tezro." (ECF 69 at 16.) As an initial matter, the first six pages of the government's Exhibit A have no reference to any affiliation with the NDC and do not establish that the referenced "M**u**hammad Asif" is the "M**o**hammad Asif" with whom BSI communicated regarding the Tezro system in 2004. Further, page 7 of Exhibit A is an email from 2006 (two years after the Tezro system was shipped to BSI) and references a "Mr. Asif from NDC" without any connection to a "Mohammad Asif." The remaining documents in the exhibit similarly are emails sent years after the Tezro system was delivered to BSI and do not prove that Mr. Syed unlawfully exported the Tezro system to NDC in 2004. This is especially true given the competing evidence that Mohammad Asif had at various points been employed with the PAEC and the Pakistan Institute of Engineering and Applied Sciences (PIEAS).

---

[2] The government also cites to an excerpt of Mr. Syed's September 16, 2020 interview regarding Mohammad Asif but as discussed in Mr. Syed's Sentencing Memorandum, that excerpt is unreliable. (ECF 67 at 22-23.)

[3] Moreover, the bank check from 2015 was for an amount of 895,396 Rupees, or approximately $8,778 USD. This relatively low amount does not help to establish that the check was provided in exchange for *any* computer systems from BSI, let alone the Tezro system 11 years earlier.

(*See* DV Ex. A, payment status document indicating the installation of a device for Asif at PIEAS; DV Ex. B, discussing sales tax invoices for "Muhammad Asif" at PIEAS; DV Ex. C, PAEC Webpage at page 5, stating that "Muhammad Asif" was a PAEC official.)

Regarding "Raj Muhammad" the only documents that the government offers purporting to connect him to NDC are (1) the same 2015 bank check which was signed by "Muhammad Asif" and the parent email attaching that bank check, which simply notes that the check was received from the office of "Raj" (no last name) (GV Ex. 97B); (2) an email from 2005 regarding the Tezro system and referencing a "Raj" (no last name and no reference to NDC); and (3) a document from 2009 showing that a "Raj Muhammad" was affiliated with the NDC, but bearing no reference to the Tezro system whatsoever (GV Ex. 98). These documents fall well short of proving that "Raj Muhammad" was affiliated with the NDC or the Tezro system transaction in 2004, particularly given that the name "Raj" is a very common name in Pakistan.

Similarly, regarding "Dr. Raza," the government simply speculates that this individual is actually "Raza Sammar" (even though the emails regarding the Tezro system do *not* mention "Raza Sammar") and that this individual was affiliated with the NDC in 2004. Then the government asks the Court to examine anachronous documents ***unrelated to the Tezro system*** and which ***have no mention of NDC*** (Exhibit B to the government's sentencing memorandum) and to conclude that the "Dr. Raza" referenced in the email regarding the Tezro system is a "Raza Sammar" allegedly affiliated with the NDC. In reality, the "Dr. Raza" in the 2005 email regarding the Tezro system likely referred to Dr. Syed Shoaib Raza, a PIEAS employee. (*See* DV Ex. D, PIEAS Meeting Minutes, identifying "Dr. Shoaib Raza" as a PIEAS member; DV Ex. E, PIEAS proposal directed to "Dr. Syed Shoaib Raza.") Thus, the government's speculation regarding "Dr. Raza" proves nothing.

In any case, putting aside the question of whether "Mohammad Asif," "Raj Muhammad" and "Dr. Raza" were NDC employees in 2004, the government's argument fails for the simple fact that there is no proof whatsoever that the Tezro system was actually sold to *anyone*, let alone the NDC. Conspicuously missing from the government's evidence is any document indicating that the NDC or any entity submitted a purchase order to BSI for the Tezro system or that BSI received a payment from the NDC (or anyone else) for the Tezro system.

This is completely consistent with Mr. Syed's version of events and the documents we have cited that establish the Tezro system was purchased by BSI to be used for demonstration purposes, but never functioned properly. Indeed, emails from October 29, 2004 and November 17, 2004 indicate that just a few months after shipment of the Tezro system, it needed to be repaired. (GV Exs. 28, 29) (noting that the Tezro system was "faulty" and was sent for repair.) In March 2005, the Tezro system continued to be defective and BSI had to order another part for repair. (GV Ex. 30) (referencing replacement part.) The Tezro system continued to malfunction in April-May 2005. (GV Exs. 32-34) (noting that various parts of the system were not working.)

In sum, the government has failed to prove by a preponderance that Mr. Syed exported the Tezro system to NDC in violation of U.S. export regulations.

## III. A Downward Departure Pursuant to § 2M5.1, Application Note 2 Is Warranted

### A. The Government's Characterization of the PAEC Is Outdated

The government argues that the end-users of the goods at issue in this case are "cause for serious concern." (ECF 69 at 18.) First, as explained above, there is no evidence that the NDC was an end-user of any of the goods at issue in this case. Moreover, regarding the government's reference to the Entity List identifying NDC "as one of the PAEC's 'subordinate entities'" (ECF 69 at 4), it bears mentioning that the Entity List was revised on October 1, 2001 to include that note. (*See* 66 FR 50090, available at 2001 WL 1147759.) As explained in Mr. Syed's Sentencing

Memorandum, Pakistan moved its nuclear weapons program *out* of the PAEC and into the NDC in or around 2001 and the PAEC is now focused on civil uses of nuclear power, not weaponry. (ECF 67 at 14-15.) In any event, as the government itself recognizes, NDC's parent organization is the National Engineering and Scientific Commission (NESCOM), not PAEC. (ECF 69 at 3, n.3.)

In response to the various sources cited by Mr. Syed indicating that the PAEC is no longer involved in the development of nuclear weaponry (including sources directly from the U.S. government), the government cites a single 2018 article (ECF 67 at 19, n. 4) that argues Pakistan "barely" separated its civil and military nuclear facilities and is "secretive" about its nuclear program, but admits that the purpose of a new power plant that was being constructed at the time "may be civil."[4] Additionally, the article acknowledged evidence indicating that "planning and expenditures for construction by the Pakistan Atomic Energy Commission (PAEC) of a fuel enrichment plant that is slated for operation in June 2022 (originally slated for a June 2018 opening) . . . appears to be part of a larger civil effort to make fuel for nuclear power reactors." The article provides no other information specific to the PAEC. In other words, this article only evinces more speculation on the part of the government.

The government also relies on an unauthenticated "internal PowerPoint presentation" attached to an email between alleged PAEC employees—notably, neither Mr. Syed nor any other BSI employee received the email—which notes that an entity called DSD (not PAEC)[5] engages in a variety of research, including fluid dynamics, plasma physics, and others, and which makes a

---

[4] *See* Institute for Science and International Security Report on Pakistan's Growing Uranium Enrichment Program (May 30, 2018), https://isis-online.org/isis-reports/detail/pakistans-growinguranium-enrichment-program/12 (last visited March 29, 2022).

[5] The government argues that this PowerPoint relates to the PAEC's Directorate of Science Division (ECF 69 at 20), but the actual PowerPoint only refers to "DSD." (GV Ex. 19B.)

single reference to research involving "detonics." (GV Ex. 19B at 2.) This sole reference made in passing in an unauthenticated document about DSD does not establish that the PAEC was something over than a civil agency focused on civil uses of nuclear power during the relevant time period.

Finally, it is worth noting that although the United States. has deemed the PAEC enough of a threat to warrant inclusion on the Entity List, the Department of Commerce has approved licenses for exports to the PAEC. A Bureau of Industry and Security license history check indicates that the Pakistan Atomic Energy Commission was an "ultimate consignee" of goods within the timeframe at issue in this case. (*See* GV Ex. 20.)

## B. The Exported Goods Were Not High Performing

Pointing to BSI's marketing materials, the government attempts to argue that the computers at issue in this case were in actuality "high performance" computers. (ECF 69 at 19.) But simply calling something "high performance" in sales literature and marketing materials obviously does not make it so. Indeed, the expert declaration provided with Mr. Syed's Sentencing Memorandum (ECF 68-4) carefully explains why the devices are not considered high performing. (*See also* ECF 67 at 20-21, 23-28.)

On this point the government also relies on the unauthenticated "internal PowerPoint" presentation for "DSD." (ECF 69 at 20-21.) But that presentation does ***not*** tie any of the computing systems referenced therein to any transaction with Mr. Syed or BSI. In any case, any bare references to "High Performance Computing" contained in the presentation are likely just references to marketing language and do not rebut the detailed analysis conducted by Mr. Robinson which describes the actual performance capabilities of the processors included in the systems at issue in this case. (*See* ECF 68-4.)

12

As we explained in Mr. Syed's Sentencing Memorandum, the *HPC Wire* news article cited by the government simply restates the marketing points provided by Computer Company A. (ECF 67 at 23.) Additionally, the government continues to offer a partial quote from the article that incorrectly suggests that the U.S. Army and NASA utilized the Onyx 3400 system (which only had 8 processors), when in reality the article was referring to Computer Company A's ***Origin 3000*** line (which had 512 processors).[6] (*Id.*; ECF 68-4 ¶ 29.)

Finally, the government cites to reports provided by scientists from Los Alamos National Laboratory in 2018. But these reports actually undermine the government's position. The scientists described the Onyx 3400 as "entirely consistent ***with an academic procurement*** for delivery in Pakistan" and that it had a "modest processor count." (ECF 68-4, Ex. 6 at BSI-DoD-000037-38) (emphasis added.) They further noted that it was "***adequate for student use*** in an academic environment however, this combination was most likely ***unsuitable for the increased computing demand required for most military applications***." (*Id.* at BSI-DoD-000033) (emphasis added.) Finally, the Los Alamos scientists concluded that the Onyx 3400 "would be a decent machine for student projects, but likely had ***insufficient memory for significant modeling and simulation work***." (*Id.* at BSI-DoD-00038) (emphasis added.)

Regarding the Tezro system (which the government has failed to prove was exported in violation of U.S. law), the scientists recognized that it had a "small processor count," and was not "particularly well-suited for large-scale simulation codes," and further opined that the "good multi-display graphics, coupled with large storage systems" made it worth the expense. (*Id.* at BSI-DoD-000050.) This hardly establishes that the Tezro system was "high performance." Moreover, the

---

[6] The contemporaneous availability of the significantly more powerful Origin 3000 line further demonstrates the relatively low-powered nature of the Onyx 3400.

scientists acknowledged that the Tezro system was designed for "the power supplies found in North America" (power supplies used in Pakistan have a different voltage), which is further evidence that the Tezro system was never properly functional in Pakistan. (*Id.* at BSI-DoD-00048.)

With respect to the Los Alamos scientists' "ultimate conclusion," as noted in Mr. Syed's Sentencing Memorandum (ECF 67 at 25), the investigating agents apparently sought to have the scientists issue an updated report to the government after their initial report failed to provide any conclusions tying the Onyx 3400 and Tezro system to possible dangerous uses. Still, the revised conclusion fails to provide any definitive analysis regarding any actual threat posed by the systems. The scientists only generally concluded that the Onyx 3400 and Tezro system "could be used for almost any purpose" and "[c]oupled with" certain software, theoretically could be used in a military setting even though "these computers would not be called 'supercomputers.'" (*Id.* at BSI-DoD-000054.) This conclusion was based on assumptions that the end-user of the software would "compile applications from source code developed by third parties or internal developers" and also "couple" it with certain "CFD software in a military setting." (*Id.* at BSI-DoD-000054.) But there is absolutely no proof of that happening in this case, or evidence of what applications and software were actually used on these computer systems during the relevant time period. The scientists cautioned that the information they were provided "did not contain details regarding acquisition dates, supported operating systems, or other such details" and accordingly "it is difficult to correlate" the hardware purchases by BSI and any software. (*Id.* at BSI-DoD-000050.)

The scientists' half-hearted conclusions based on assumptions and hypotheticals do not establish that the Onyx 3400 and Tezro system posed any real threat to United States national security. Indeed, it is telling that after executing multiple search warrants and obtaining several gigabytes of data as of 2018, the government could not provide any information to the Los Alamos

14

scientists that would lead them to conclude that the computer systems posed any actual risk or threat to national security. For all of these reasons, a downward departure under § 2M5.1, Application Note 2 is appropriate.

## IV. The Government Fails to Prove that Mr. Syed Was an Organizer and Leader of a Criminal Activity Involving Five or More Participants

As explained in Mr. Syed's Sentencing Memorandum, a four-level enhancement under USSG § 3B1.1(a) is inapplicable because the government cannot prove that there were five or more participants involved in the criminal activity at issue in this case. (ECF 67 at 29-34.)[7] For purposes of USSG § 3B1.1(a), a "participant" is someone "criminally responsible for the commission of the offense." (USSG § 3B1.1(a), App. Note 1). A participant cannot be a "mere unknowing facilitator[] of crime," rather, the participant must "give[] *knowing aid* in some part of the criminal enterprise." *United States v. Hall*, 101 F.3d 1174, 1178 (7th Cir. 1996) (emphasis added). The government's proffered evidence does not establish that Co-Conspirators A-E all meet the definition of "participant."

First, the government has failed to establish that all five Co-Conspirators understood let alone willfully violated U.S. export laws. The government points to a January 12, 2009 email forwarded to Co-Conspirators A-D to show that they "knew of U.S. export laws" (ECF 69 at 25). At the very bottom of the forwarded email, Computer Company A notes that PAEC is a "prohibited

---

[7] The government argues that under the plea agreement, Mr. Syed admitted to conspiring with five other persons to violate U.S. export laws and that failing to do so would have "jeopardized not only his eligibility for an acceptance of responsibility" but also "his guilty plea itself." (ECF 69 at 27 n.6.) In entering into the plea agreement, Mr. Syed was required to plead guilty to Count One as charged, and the plea agreement simply restates the language of the indictment, including the language stating that Mr. Syed "did conspire with" the five Co-Conspirators. (ECF 56 at 2.) This language alone does not establish facts sufficient to apply the role enhancement under USSG § 3B1.1(a). The government does not directly argue to the contrary or provide any case law to suggest otherwise. Importantly, the parties' plea agreement expressly reserved Mr. Syed's right to present evidence and argument to the Court on this point. (*Id.* at 18.)

end-user." (GV Ex. 6A.) But the purpose of Mr. Syed's forwarding of the email was to ask his employees to fill out the attached form in regards to an order for PIEAS. (GV Ex. 6A.) The form itself does not contain any language regarding U.S. export laws or regulations. (GV Ex. 6B.) The government simply wants the Court to accept its assumption that all of these employees, who were non-native English speakers, read and understood the legal impact of the language at the very end of the forwarded email, even though the statement came from a private party and the focus of the transaction and email concerned PIEAS, which was ***not*** a prohibited end-user. That assumes far too much.

The government further relies on a May 6, 2005 email to Co-Conspirator B (ECF 69 at 25), but that does not relate to any transaction at issue in this case. Nor does the email establish whether Co-Conspirator B actually read and understood the attached end-user forms, or simply forwarded them on to others for signature, as Mr. Syed's email requested him to do. (GV Ex. 4A.) Again, the government improperly seeks to establish criminal conduct based on assumption.

Regarding the BSI sales proposals, there is nothing that proves Co-Conspirators A, B, C, or D had any role drafting the proposals, which simply state "Business Systems International Pvt. Ltd. will organize the Export License from US Government." (*See, e.g.*, GV Ex. 5B at BSI-EX-000034.) This is entirely consistent with the fact that Mr. Syed alone was responsible for ensuring that BSI was compliant with U.S. export laws (*see* ECF 69 at 30-31) and provides no support for the claim that any, let alone all, of the co-conspirators had knowledge of U.S. laws and willfully violated them.

Finally, the August 27, 2015 email cited by the government (GV Ex. 12) does nothing to establish knowledge of export laws on behalf of Co-Conspirator E, as the documents attached to Co-Conspirator E's email were not completed by him but were simply forwarded by him. There

16

is nothing to suggest that Co-Conspirator E actually read the forms or any language regarding U.S. export laws contained therein, or that he would have had any reason to do so. Again, the government is assuming too much.

The government's evidence regarding the "active steps" the Co-Conspirators took is similarly unavailing. With respect to the government's claim that Co-Conspirator A submitted a purchase order falsely identifying Taxila University as the end user of the Onyx 3400, this information was not false, as we explained above. Regarding the May 2004 documents relating to the Tezro system, the Tezro system was **not** exported to the NDC or any other entity, as we explained above. As for emails relating to the Onyx replacement parts, the role of the Co-Conspirators in obtaining the parts has little if any bearing on the question of whether each of them **knowingly falsified** any end-user documentation regarding the replacement parts. None of the exhibits referenced by the government (GV Exs. 36A-39B, 41) demonstrates that any of the Co-Conspirators completed any end-user forms for the Onyx replacement parts, let alone **falsely** completed them.

Regarding the Altix 450, the government claims that Co-Conspirators A-D "each took part in either" processing the order for the Altix from PIEAS, drafting a BSI sales proposal, or submitting the PIEAS order to Computer Company A. (ECF 69 at 26.) It is important to note that PIEAS is not on the prohibited end-user list. (ECF 67 at 16, 31.) The unlawful act pertaining to the Altix 450 consisted of causing Computer Company A to submit false export information identifying "Taxila Engineering University" as the "ultimate consignee" of the items rather than PIEAS. (*Id.*) Accordingly, processing the order from PIEAS and drafting sales proposals to PIEAS were not "active steps" in furthering this activity. Rather, the evidence shows that only Co-

17

Conspirator B took any action to fill out the export documentation provided to Computer Company A that referred to Taxila. (GV Exs. 49, 55.)

The government's evidence regarding the Computer Company C systems and the transceivers fare no better. On the Computer Company C systems, the evidence cited by the government shows only that Co-Conspirator B submitted any documentation to Computer Company C. (GV Ex. 74.) With respect to the attempt to purchase transceivers from Computer Company C, the only two individuals involved in completing any end-use statements or relaying information about the end-user were Co-Conspirator B and Mr. Syed. (GV Exs. 81, 82.) Although Co-Conspirator E forwarded a purchase order to Computer Company B, the purchase order was signed by Co-Conspirator B and there is no evidence that Co-Conspirator E played any role in its creation or had any understanding of its contents. (GV Ex. 79.) At best, the remaining documents cited by the government simply show that the other alleged co-conspirators were merely copied on emails relating to the Altix 450 and Computer Company C systems. Being copied on an email plainly is insufficient to establish knowing criminal involvement by a recipient.

Indeed, the government's argument with respect to the role enhancement is almost entirely dependent on emails to which the Co-Conspirators were simply copied and which at most make passing reference to U.S. export laws. From this, the government asks the Court to leap to a conclusion that each of the Co-Conspirators read the emails—and in particular, the buried language therein regarding export laws—understood them, had some reason to do so, and then acted with criminal intent. That is a bridge too far. Because the government's evidence is insufficient to establish by a preponderance that five or more participants gave "knowing aid in some part of the criminal enterprise," the four-level enhancement under USSG § 3B1.1(a) is not justified. *Hall*, 101 F.3d at 1178 (7th Cir. 1996). *See also United States v. Caputo*, No. 07 CR 458-

18

4, 2010 WL 1032621, at *1-2 (N.D. Ill. Mar. 17, 2010) (declining to apply the four-level enhancement under § 3B1.1(a) where there were only two participants in the criminal activity and the scope of the criminal activity was not "otherwise extensive").[8]

## V.    A "Significant Sentence of Imprisonment" Is Not Warranted

Mr. Syed's Sentencing Memorandum (ECF 67) sets forth a complete picture of the nature and circumstances of the offense, Mr. Syed's history and characteristics, and the minimal threat Mr. Syed's conduct imposed – each of which refutes the government's arguments that the factors of 18 U.S.C. § 3553(a) require a "significant sentence of imprisonment." (ECF 69 at 29-30.) However, certain assertions in the government's memorandum require response.

The government concedes that the "need for specific deterrence here is not great" and that Mr. Syed's risk of recidivism is low. (ECF 69 at 29). Yet, the government claims that "[p]eople who work in this field are watching" and that a "significant sentence of imprisonment" is required to promote adequate deterrence. (*Id.*) Respectfully, the government's argument is seriously undermined by the lack of urgency and protracted delay investigating and prosecuting Mr. Syed during the roughly ten-year period in this case. (ECF 67 at 35-37.) During that time, the government executed search warrants on various devices and email accounts, yet did not arrest Mr. Syed, seize his passport (indeed, he took several international trips during this time period while he was aware of the government's investigation), or take any other action to prevent Mr. Syed from engaging in commerce that the government now claims was a threat to national security. (*Id.*) To the extent "[p]eople who work in this field" are actually watching, the government's own actions provide a multitude of reasons for those people to believe that they could avoid prosecution in similar cases. In this respect, the government's own actions render

---

[8] If the court is inclined to apply any role enhancement in this case, no more than a 2-level enhancement pursuant to § 3B1.1(c) would be appropriate.

toothless their argument that a substantial prison sentence for Mr. Syed is required to "make plain to the public at large that export violations affecting national security are serious and those responsible for them will not be treated lightly." (ECF 69 at 29.) Imposing a significant prison sentence on Mr. Syed now would be unfair and unjust when the evidence strongly suggests that the government itself did not view Mr. Syed's actions to be particularly threatening.

Finally, the government finds it "disappointing" that the timing of certain aspects of Mr. Syed's offense overlapped with his efforts to become a naturalized citizen of the United States. (ECF 69 at 31.) Without directly saying it, the government implies that Mr. Syed took a false oath of allegiance to the United States because he was willfully threatening United States security interests through his business activities. Nothing could be further from the truth. Mr. Syed is eternally grateful for this country and the opportunities it has afforded him and his family. (ECF 68-1.) There is absolutely no evidence that Mr. Syed acted with the intent to threaten national security. Rather, his regrettable actions resulted from his desire as a businessman to consummate five isolated transactions over a 13-year period in order to turn a profit. The use of false documentation was motivated by an effort to make sales expeditiously, so as not to lose out on the opportunity. This is not offered as any justification or excuse for Mr. Syed's offense, for which he accepts responsibility and is deeply remorseful. But it is a far cry from the heavy implication that Mr. Syed willfully took action with the specific intent to aid foreign "enemies" and harm the country that he, his wife, children, and grandchildren all call home.

## **CONCLUSION**

Neither the government's requested sentence nor the Probation Officer's recommended sentence is supported by the facts and circumstances of this case. Either would be unduly harsh. For the reasons set forth in Mr. Syed's Sentencing Memorandum and Supporting Exhibits, and in this Response Memorandum, Mr. Syed respectfully submits that a sentence of time served (ten

days) and a two-year period of supervised release is appropriate because it is "sufficient, but not greater than necessary" considering the sentencing factors of § 3553(a).

Respectfully submitted,

OBAIDULLAH SYED

By:    */s/ Ryan Hedges*
                One of His Attorneys

Ryan S. Hedges, Esq.
Junaid A. Zubairi, Esq.
Nusra Ismail, Esq.
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 312 609 7500
rhedges@vedderprice.com
jzubairi@vedderprice.com
nismail@vedderprice.com

Dated:  March 31, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **DEFENDANT OBAIDULLAH SYED'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM** on March 31, 2022 with the Clerk of the Court using the CM/ECF system and that a copy of the foregoing was served upon counsel of record via the Court's CM/ECF system.


*/s/ Ryan S. Hedges*
Ryan S. Hedges